The opinion of the court was delivered by
McEnery, J.
Schuyler B. Steers was born in the county of Otsego, State of New York, in 1832. He moved from there to Virginia; thence to Racine, Wisconsin; to' Columbus, Mississippi; to Shreveport, Louisiana, in 1869 or 1870, and to the city of New Orleans in 1876.
He married Mrs. Kate Clarke, who died June 1, 1888, in Otsego county, and her succession was opened there and also in New Orleans. Her sister, Mrs. Helen Clarke Evans, was appointed administratrix of her succession in Louisiana April 4, 1893.
Schuyler B. Steers, the husband, died in Otsego county December 13, 1889. He left a will which was there probated. He lived in *1552 New Orleans, engaged in commercial or manufacturing business many years before his death and acquired a large amount of property while residing here.
A copy of his will and a record of its probate in Otsego county were presented and filed in the Oivll District Court, parish of Orleans, by Frederick A. Savile, executor, and its execution ordered and letters testamentary were issued to him.
Savile, the executor, filed an account, and Mrs. Evans, administratrix of the succession of Mrs. Steers, filed an opposition, alleging that the executor had failed to account for rents and revenues derived from real estate belonging to said succession, and for the share of Schuyler B. Steers in the partnership of which he was a member. She also claimed that Schuyler B. Steers was indebted for the paraphernal funds of his deceased wife, which he had converted to his own use and which were administered by him, and for promissory notes, shares of stock in various corporations, which formed a part of the community existing between him and his deceased wife, which were converted by him after the death of his wife. The prayer in the opposition was in accordance with the averments in the petition.
After the filing of her opposition Mrs. Evans brought a separate suit against the executor, alleging the domicile of Schuyler B. Steers to have been, at the time of his death, in the city of New Orleans. The averments in this separate suit are similar to those in the opposition, and the prayer is that the share of Mrs. Steers, deceased, in the community be fixed and determined.
The answer of the executor denied that Steers was domiciled in New Orleans, and that there was any community existing between him and his wife, or the conversion of paraphernal funds, stocks, etc., or of any indebtedness to his deceased wife’s succession.
Mrs. Martha Perry and others, alleging themselves to be heirs of Mrs. Steers, intervened and joined the executor in resisting the claims of plaintiff and appellant. There was 'judgment for the intervenor and the opposition to the account was dismissed.
As to the immovable property acquired in Louisiana during the marriage, the lex rei sitse will govern. Story, Conflict of Laws, par. 423; 20 Johns. 267.
The evidence shows this to be incumbered, and there is no controversy as to the eventual interest of the heirs of Mrs. Steers in the property.
*1553 If, as contended by the executor, the domicile of Schuyler B. Steers was in Otsego county, at the time of his wife’s death, the personal property followed the law of the domicile, and it passed to the husband as a legal assignment by operation of the law of the domicile, and which is recognized extra-territorially. Id.
The most important fact, the only one at issue that can be determined, is the domicile of Schuyler B. Steers at the time of the death of his wife. There is no difficulty in ascertaining what the law defines as a domicile. It is the place where a man has his true, fixed and permanent home, and to which, when he is absent, he has the intention of returning. Tanner vs. King, 11 La. 175.
The main question to decide is where a person has his home, in the language of the Code his “ principal establishment,” and where he exercises his political rights.
Domicile may be either national or domestic. The former is one in which nationality a man is domiciled, and the latter in which subdivision of the nation. And in this respect the law of domicile in Louisiana, in relation to its different political subdivisions, may be ap - plied to the change of domicile from one State to another.
In not keeping in view the distinction between the two kinds of domicile, in some cases in this country, the domicile of birth, as recognized in England, has been given too much weight in estimating the value of the floating intention to return to the first domicile. The conditions which control the destinies of families in the two countries are materially different. In one it is a rule to keep families together. They grow up for generations on the same spot. Local traditions control them, and there is not entirely obliterated some influences of the feudal period. Here the customs, the habits of the people; their ceaseless energies, their continuous change from locality to locality, the sudden and dense population of new places, the desertion and abandonment of old ones, all show that the people are migratory, and not much influenced by birth, locality, or the local history of families.
Hence, we conclude that it will require the same facts only to show a change of domicile from the domicile of birth that it would require to show a change from one selected domicile to another. The revival of the intention to return to the domicile of birth does not apply when the domicile of origin and of selection are both domestic. American Leading Cases, 714.
*1554 To change from one domicile to .another there must be an intention to abandon the former domicile. A residence merely is not sufficient, as this may be for special purposes, such as for health, for recreation, for commercial purposes. The nature of the residence may rebut the presumption of the animo manendi. The intention to make a place his permanent home may exist, but this is not sufficient to establish a domicile unless the intention is accompanied by some act in furtherance of such intention. 5 Pick. 370; 5 Md. 186.
We have no concern with the residence of Schuyler B. Steers in Virginia, Wisconsin or Mississippi. The question is was he domiciled in Louisiana at the time of the death of his wife on June 1, 1888?
In determining this fact we will proceed on the presumption that the law favors the continuance of domicile. 21 Penn. 106; 5 Pick. 370.
And that the original domicile continues till it is finally changed for another. Story Conflicts of Laws, par. 481; 10 N. H. 156; 10 Pick. 77; 1 Texas, 673.
Applying the law to the facts in the record, we are to ascertain whether Schuyler B. Steers acquired a domicile in Louisiana, and if so, did he abandon it, and acquire a domicile in Otsego county, Kew York.
The character of the residence can form no important part in fixing the domicile, unless it is of that character which rebuts the presumption of a fixed intention to remain.
It is, therefore, immaterial whether he lived in a hired house, boarding house, or his own dwelling. If it was his intention to permanently remain in Louisiana and his declaration and his acts show that he intended to remain for an indefinite period, as a place of present fixed domicile, it will constitute his domicile, though he may have had an idea, at some future time, of returning to the original domicile.
The civil law attaches almost equal importance to the place of business, and of residence, as fixing the place of domicile. Story Conflicts of Laws, par. 42.
But we think it more in keeping with our social conditions and political systems to accept the rules of the common law, to fix the domicile of a person where he has his home, and exercises his poli *1555 tical rights. Such in fact is the concurrence of the decrees of the courts of this State.
While the presumption of original domicile continues until fixed elsewhere, when a person has acquired a residence elsewhere, this will be presumed to be his domicile until the facts establish the contrary. 2 Kent, 532.
Steers came to Louisiana in 1870 and located at Shreveport, lived in boarding houses, and also kept house, but did not purchase resident property. He bought and sold property. In the acts of sale he was described as being “ of the city of Shreveport.” He voted once there. In 1876 he came to New Orleans and engaged in the business of manufacturing and selling cotton presses. He lived here at boarding houses; kept house at one time on St. Charles avenue in 1885, and finally, with his son-in-law, purchased a residence in 1887, und with him kept house in New Orleans. The purchase price of the house and the household expenses were paid, two-thirds by Steers and one-third by his son-in-law, Savile. The inventory shows that his house was well furnished, indicating that it was prepared for a permanent residence. The inventory taken of the property, at which Savile, the son-in-law and executor, assisted, describes all the property, movable and immovable, in the succession, which amounted to some $80,000, as belonging to the community existing between Steers and his deceased wife. At the general election, 17th April, 1888, Steers registered and voted in the city of New Orleans. In all the public acts of sale passed to Steers of the property purchased in New Orleans, he is described as “ being of this city.” This declaration, of course, means that he resided in the city. All his acts and declarations go to show that he was identified with the interests of the State and regarded it at least as his present fixed domicile.
That the deceased contemplated going back to Otsego county at some future time, there is little doubt. He spoke of it as early as 1881, and in 1883 he bought a place called Lakeland, and fixed it up in a manner that would indicate that he expected, at least, to spend his declining years there. He was in the habit of going to Otsego county every summer, but would return to New Orleans in the fal or winter, and sometimes during the summer, to transact his business. That he and his wife were fond of the place, Lakeland, the evidence discloses, and that Mrs. Steers regarded it as a home is certain. In *1556 reference to the declarations which were offered in evidence to show the intention of making that the domicile of Steers, we are furnished principally those of Mrs. Steers, who, it appears, had no kindly feeling for the people of the South, or of the climate of this latitude. Steers, on the contrary, liked it, at least to the extent of its promoting his health, and it is not unreasonable that he should have said he liked the people among whom he had prospered. His will was made before the death of his wife in Otsego, in which he declared himself a resident of that county, and it was probated there. But this probate was after the death of his wife, whose heirs contend that at the date of her death he was domiciled in New Orleans. He voted in Otsego county 6th of November, 1888, and this act also was after the death of his wife.
Comparing and analyzing the testimony in the record, we are of the opinion that on the 1st June, 1888, Schuyler B. Steers had his domicile in the city of New Orleans. It is not to be disputed that the intention maybe afterward grafted upon the temporary residence in order to fix the domicile. It is not to be disputed that Sehuylér B. Steers had in the beginning a temporary residence in Shreveport, and his voting there, and his declarations in public acts may be received as evidence of his intention to make Louisiana his adopted State. And his declarations in seven public acts as to his residing in New Orleans, and his voting at the general election in 1888; his long residence in the city, and his manufacturing business betng located there, all show,- we think, conclusively, that he regarded Louisiana as his adopted State and the city of New Orleans as his domicile.
Under the Constitution of 1868 it was required that a voter should be a resident of the State. A registration certificate was requisite to entitle one to exercise the right to vote, and to this a sworn statement was made as to residence. When Steers voted in Shreveport he, under oath, declared that he was a resident of Louisiana.
Under the Constitution of 1879 the voter must be an actual resident of the State.
The fact to which Steers made oath when he obtained his registration certificate, upon which he voted, was that at the election he would be a resident of the State at least one year. The facts furnished the registrar of voters by him, to obtain the certificate, were that he resided at 220 First street; kept house there, was a ntanu *1557 facturer; had resided in the State twenty-five years, in fhe city of New Orleans twenty-five years, and this statement was signed by him.
These acts of voting were not impulsive. They were the result of deliberation. He had ample opportunity to reflect, as he had to prepare for voting, by obtaining a certificate which would entitle him to the privilege. Voting may not be conclusive evidence of domicile, as it may be shown that the vote was fraudulently east. But when there is no question of fraud, and it is the act of the party, supported by his oath, as to the right to vote, it is an important fact, in connection with residence, to fix the intention as to domicile. State vs. Steele, 33 An. 910; McKowen vs. McGuire, 15 An. 639.
And the same may be said of repeated declarations in public acts as to residence. Sanderson vs. Ralston, 20 An. 312.
A person may have a residence in one place and a domicile in another. He can have several residences, but only one real domicile. 33 An. 910, cited above.
Under the definitions of domicile in the Code we think Steers’ principal establishment was in New Orleans, where he was surrounded with his family, in a residence fixed with all the comforts of life, where his only business was conducted and where he exercised all his political rights, and in which place he had resided the greater part of each year for twelve years.
Lakeland had been purchased, no doubt, for temporary residence during summer, and which he had probably an intention of making his permanent home, as, according to the statements in the record, he was meeting competition in business by other patents claiming to be superior to his cotton press, and he may have regarded his business as closing its career.
But prior to June 1, 1888, he had done no act to carry the intention into effect. There is not sufficient evidence in the record that he had abandoned New Orleans as his domicile. After he purchased Lakeland he continued to reside in New Orleans the greater part of the time, and the fact of his voting in said city is an evidence that in April, 1888, he had not then fixed his domicile in Otsego county.
If the declarations of Steers in the act of mortgage on the Lake-land place, and the bonds secured by it, to the same effect, that Lakeland was his home, they are rebutted by his continued residence in New Orleans and the exercise of his political rights.
*1558 It is certain he could not acquire a domicile elsewhere while he continued to reside in New Orleans, keeping up his home, his business, and exercising his political rights. During his residence in New Orleans all the circumstances usually relied upon to establish a domicile occurred — his repeated declarations, the payment of personal taxes, the establishment of a place of business, the acquisition of a home and the exercise of political rights (Mitchell vs. United States, 21 Wal. 350). Having acquired a domicile in New Orleans, it is presumed to continue until it is shown to have been changed. The facts do not show that he acquired a new domicile in Otsego county, New York. It is not shown that he resided there with the intention to remain permanently. Id.; Fidelity Trust and Safety Vault Company vs. Preston, 28 S. W. Rep. 658.
The facts in the record do not enable us to issue any decree as to the amount of the community interest of the opponents. The partnership in which the deceased was a member has not been settled and there are many outstanding claims against the succession. Nor are we able to issue a decree in relation to the paraphernal funds of Mrs. Steers, alleged to have been converted by the husband. It seems that she received $5500 from her father’s succession, but we find no evidence that it went into the hands of the husband. She owned some shares in compress companies, but as those shares were acquired during the community, we are unable to say how or in what manner they were acquired by Mrs. Steers, whether purchased by her with paraphernal funds, or given to her by her husband in payment of paraphernal claims.
The residuary interest in the community of the heirs of Mrs. Steers can only be ascertained by a settlement of the succession in New York and in Louisiana.
• It is therefore ordered, adjudged and decreed, that the judgment appealed from be avoided and reversed, and it is now ordered, adjudged.and decreed, that a community of acquets and gains existed in Louisiana between Schuyler B. Steers and his wife, Mrs. Kate Steers, during the period of their residence in Louisiana to June 1, 1888, and that the plaintiffs and appellants, heirs of Mrs. Steers, be recognized as entitled to the residuary interest in the community, which would have gone to Mrs. Steers.
It is further ordered, that the rights of said heirs, opponents and plaintiffs, be reserved as to the paraphernal funds and separate *1559 property of Mrs. Steers, alleged to have been converted by her husband and the executor.
It is further ordered that this case be remanded to be proceeded with in due course of law; appellee to pay costs of appeal.